# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 03-1142

ROBERT STEINHAUER,

*Plaintiff-Appellant,*

v.

LAURA DEGOLIER and STATE OF WISCONSIN,

*Defendants-Appellees.*

_____

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 02-C-0280C—**Barbara B. Crabb**, *Chief Judge.*

_____

ARGUED SEPTEMBER 4, 2003—DECIDED FEBRUARY 24, 2004

_____

Before FLAUM, *Chief Judge,* and EASTERBROOK and MANION, *Circuit Judges.*

MANION, *Circuit Judge.* After Laura DeGolier, the executive director of the Wisconsin Conservation Corps, fired Robert Steinhauer, he sued DeGolier under 42 U.S.C. § 1983 and the State of Wisconsin under Title VII for sex discrimination. The district court granted the defendants summary judgment, concluding that Steinhauer failed to present sufficient evidence of sex discrimination under either the direct or indirect method. Steinhauer appeals. We affirm.

## I.

In 1983, the Wisconsin State Legislature created the Wisconsin Conservation Corps ("WCC"). The WCC's mission is to employ young adults in projects involving resource conservation. In February 1999, then-Governor Tommy Thompson appointed Laura DeGolier to head the WCC as its executive director. DeGolier later hired Eileen Stevens to serve as the human resources coordinator. In turn, Stevens recommended that DeGolier hire Robert Steinhauer. DeGolier accepted Stevens' recommendation and, on June 12, 2000, hired Steinhauer as a personnel assistant. Steinhauer's primary duties were to assist with the employment and supervision of WCC enrollees and to provide enrollee support and training.

After he was hired, Steinhauer apparently did not mesh well with Stevens and DeGolier. He was not the only one to butt heads with the two: It seems that DeGolier's approach to management was far different from that of her predecessor. DeGolier exerted more authority and took a much more hands-on approach, and she often belittled staff members and criticized the way they had done things in the past. Stevens' support of DeGolier also rubbed the WCC staff the wrong way, and over the next year or so several WCC staffers left or were terminated. Steinhauer was one of the staff members who were fired; DeGolier fired him the day before his probationary period ended, claiming that she did so after Stevens complained that she could no longer work with Steinhauer. After he was fired, Steinhauer sued DeGolier under 42 U.S.C. § 1983 and the State under Title VII for sex discrimination.

Following extensive discovery, the defendants moved for summary judgment. Steinhauer argued that he presented sufficient direct and circumstantial evidence of sex discrimination under the direct method to withstand summary

judgment. Specifically, Steinhauer pointed to various comments allegedly made by Stevens and DeGolier evincing an anti-male bias; two cartoons published in a weekly newsletter which made fun of men; allegations of incidents where Steinhauer's duties were altered; conversations Stevens and DeGolier had with another WCC staffer concerning their divorces; the fact that five men left during DeGolier's tenure at the WCC; and DeGolier's alleged comments that she wanted to replace the male project team leaders.

The district court reviewed this referenced evidence and concluded that it failed to create a reasonable inference of sex bias and thus did not support a claim of sex discrimination under the direct method. The district court also rejected Steinhauer's attempt to establish discrimination under the indirect *McDonnell-Douglas* method because the WCC replaced Steinhauer with a man, and therefore he could not establish a prima facie case of discrimination. Accordingly, the district court granted the defendants summary judgment. Steinhauer appeals.

## II.

On appeal, Steinhauer argues that the district court erred in granting the defendants summary judgment. Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Our review of a decision on summary judgment is *de novo. Haugerud v. Amery Sch. Dist.*, 259 F.3d 678, 689 (7th Cir. 2001).

To avoid summary judgment on his sex discrimination claims, Steinhauer must present facts from which a reasonable juror could find that the defendants terminated him because of his sex. *Markel v. Board of Regents of Univ. of Wis.*,

276 F.3d 906, 910 (7th Cir. 2002). This applies under both Title VII and Section 1983. *Friedel v. City of Madison*, 832 F.2d 965 (7th Cir. 1987) ("When the plaintiff alleges intentional discrimination . . . it is clear that the same standards in general govern liability under sections 1981, 1983, and Title VII."). There are two methods of proof available to Steinhauer—the indirect method and the direct method. *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003). Steinhauer relies on both, which we consider in turn below.

## A. Indirect Method

Steinhauer contends that he presented sufficient evidence under the indirect method to avoid summary judgment. Under the *McDonnell-Douglas* indirect method, the plaintiff must establish a prima facie case of discrimination. The burden then shifts to the employer to articulate a legitimate non-discriminatory reason for its employment action. At this point, the employer is entitled to summary judgment unless the claimant can present sufficient evidence that the employer's proffered reason is a pretext for discrimination. *See Mills v. Health Care Serv. Corp.*, 171 F.3d 450, 454 (7th Cir. 1999).

To establish a prima facie case, Steinhauer must show (1) he was a member of a protected class; (2) he was qualified for the position; (3) he was fired; and (4) he was replaced by a woman, or that a similarly situated woman was treated more favorably. *See Mills*, 171 F.3d at 454. The first element is really a non-issue because everyone is male or female. The third element is also clear as Steinhauer was terminated from his employment. The defendants, however, claim that Steinhauer was not qualified for the position (the second element) and that he failed to establish that he was replaced by a woman or that a similarly situated

woman was treated more favorably (the fourth element). Because, as discussed below, Steinhauer's case clearly falters on the fourth element, we need not decide whether he was sufficiently qualified for the position.

In this case, DeGolier replaced Steinhauer with another man, Chan Voeltz. Therefore Steinhauer cannot establish the final element of the prima facie case by establishing that he was replaced by a woman.[1] Steinhauer also attempts to establish the fourth element of the prima facie case by pointing to allegedly disparate treatment involving a female co-worker, Michelle Purifoy. In this regard, Steinhauer claims that he was fired for having a private conversation with Purifoy, but the fact that she was not terminated

---

[1] Steinhauer attempts to establish that he was not replaced by Chan Voeltz, claiming that Voeltz did not perform all of the same functions as Steinhauer had. In support of his position, Steinhauer points to the deposition testimony of a former co-worker, Donald Hammes. In his deposition, Hammes stated that in his opinion Voeltz did not replace Stenhauer, "[a]t least not in the sense that Chan did the three jobs [Steinhauer had performed]." However, Hammes' testimony was without foundation, as he was not in the position to know the appropriate responsibilities of the various employees. Moreover, in his deposition Hammes qualified his statement by saying: "[Voeltz] was hired *as far as I know* to do purely human resource work. . . ." Moreover, Hammes admitted in his deposition that Stevens had told Chan that he would be doing some projects work, some training work, and that he would be getting out in the field more. This contradicted Hammes' testimony that Voeltz was hired "as far as I know to do purely human resource work. . . ." Conversely, the defendants presented clear evidence that DeGolier hired Voeltz on January 14, 2001 to fill Steinhauer's position, and Hammes' speculative and inconsistent deposition testimony fails to create a genuine factual dispute on this issue.

establishes the fourth prong of the prima facie case. DeGolier admits that she decided to fire Steinhauer in part because he had met with Purifoy. The defendants also admit that Purifoy was not fired as a result of that meeting.[2] However, Purifoy and Steinhauer were not similarly situated because Steinhauer was still on probation while Purifoy was not. *See Spath v. Hayes Wheels Int'l-Indiana, Inc.*, 211 F.3d 392, 397 (7th Cir. 2000) (holding that comparable employees must be similarly situated "in all respects") (internal citation omitted); *Bogren v. Minnesota*, 236 F.3d 399, 405 (8th Cir. 2000) (probationary state trooper not similarly situated to non-probationary state trooper); *McKenna v. Weinberger*, 729 F.2d 783, 789 (D.C. Cir. 1984) (female probationary employee not similarly situated to male permanent employee). Thus, Steinhauer cannot establish the fourth element by pointing to Purifoy's continued employment, and his case fails under the indirect *McDonnell-Douglas* burden-shifting approach.[3]

---

[2]   Apparently when DeGolier took over at the WCC, she believed employees spent too much time visiting with each other and attempted to reform the work ethic of the employees. Also, according to DeGolier, Steinhauer would question other employees about things unrelated to his job, and some of the employees complained about Steinhauer intimidating them. For these reasons, DeGolier directed the employees not to meet with each other. Although there is some dispute as to who complained about Steinhauer, and the extent of the complaints, that factual dispute is immaterial because Steinhauer failed to establish a prima facie case of sex discrimination.

[3]   Because Steinhauer failed to present a prima facie case of sex discrimination, the burden never shifts to the defendants to present a non-discriminatory reason for his discharge. Accordingly, any claim of pretext by Steinhauer is irrelevant. Thus,

(continued...)

## B. *Direct Method*

Steinhauer also attempts to establish sex discrimination under the direct method. To avoid summary judgment under the direct method, Steinhauer must present sufficient direct or circumstantial evidence to create a reasonable inference that he was fired because of his sex. *Volovsek v. Wisconsin Dept. of Agr., Trade & Consumer Prot.*, 344 F.3d 680, 689 (7th Cir. 2003). In this case, Steinhauer points to numerous facts and comments which he believes constitute direct and circumstantial evidence of sex discrimination. However, as discussed below, the record does not support Steinhauer's position.

First, many of the facts Steinhauer points to provide no insight as to DeGolier's motivation at all, much less indicate that she discriminated against him because of his sex. For instance, Steinhauer claims that DeGolier's hiring of someone else to make a presentation at a crew leader workshop, removing him from recruiting trips, and requiring him to make his own travel arrangements constitutes circumstantial evidence of sex discrimination. But to say that this is evidence of sex discrimination begs the question of why DeGolier altered Steinhauer's job responsibilities; the change by itself provides no evidence of motivation, much less evidence that DeGolier terminated Steinhauer because

---

(...continued)
although Steinhauer claims there is an issue of fact as to whether his co-workers complained about him, that is irrelevant because such facts relate to the question of pretext, which this case does not reach since Steinhauer failed to establish a prima facie case.

of his sex.[4] And for Steinhauer to claim that DeGolier made these decisions because of his sex is mere speculation which cannot defeat summary judgment. *See, e.g., Mills v. First Federal Sav. & Loan Ass'n of Belvidere*, 83 F.3d 833, 841-42 (7th Cir. 1996).

Similarly misplaced is Steinhauer's reliance on the fact that DeGolier made negative comments about certain male employees, calling one a "little Hitler"; that she raised her voice at certain male employees; that she continually put down several male employees; and that five males left the WCC or were terminated. Again, this evidence begs the question of why she criticized and put down the men, and why they left WCC. Although Steinhauer believes it was the result of sex discrimination, there is no evidence in the record to support this assertion, and his claims are once again based on speculation and thus insufficient to avoid summary judgment. *Mills*, 83 F.3d at 841-42. Moreover, the record demonstrates that DeGolier also criticized and belittled females working in the office, and that female subordinates also left the WCC during DeGolier's tenure because of her management style. Additionally, DeGolier hired males as replacements for some of the former WCC workers. Without some evidence indicating that sex mo-tivated DeGolier's management style and the discharge

---

[4]   Steinhauer does not claim that any of these changes constituted an adverse employment action supporting a separate claim of discrimination. *See, e.g., Traylor v. Brown*, 295 F.3d 783, 788 (7th Cir. 2002) (noting that Title VII prohibits employers from discriminating against employees with respect to the "terms, conditions or privileges of employment," which requires the employee to show that he suffered a materially adverse employ-ment action). Rather, Steinhauer relies on these alleged changes as proof that he was fired due to his sex.

(constructive or otherwise) of these other individuals, the fact that DeGolier raised her voice and criticized some male employees and that they later left the WCC does not create a reasonable inference of sex discrimination.

Steinhauer next argues that "DeGolier made it very clear that she wanted to get rid of the men on the projects teams . . . [and] that it was her intent that females control WCC." Steinhauer claims these statements create an inference of sex discrimination. However, a review of the record demonstrates that the project department consisted of all men. Thus, DeGolier's alleged statement that she wanted to get rid of the men on the projects teams does not indicate an intent to discriminate against men in general, but to terminate certain of the individuals serving as project team leaders, all of whom were men. Similarly, a review of the record demonstrates that as to DeGolier's supposed intent to have females control the WCC, what Steinhauer actually said in his deposition was: "[DeGolier] made it very clear that she had a time line to which she would be working with the organization and when that was done and until a successor was named she was going to pick Eileen [Stevens] . . . to lead because there's no way she was going to allow the men in the projects to take it over." Again, only men served in the projects department, and the record indicates that DeGolier found their work unacceptable. Thus, her not wanting those individuals to take over does not indicate an anti-male hostility, nor does her alleged intent to have Stevens as the successor. It merely indicates a preference for a specific individual, who happens to be a female.[5]

---

[5] In addition to Steinhauer's statement about DeGolier's alleged intent, he cites to an affidavit from former co-worker Rebecca

(continued...)

These facts are analogous to those in *Mills*, 83 F.3d at 833. In *Mills*, in support of her age discrimination claim, Mills stated in an affidavit that a supervisor had told her "that management was out to get rid of me and [another employee], the two oldest employees at the time. Mr. Silver mentioned something about management's concern that we may not be able to keep up with the regulations. I took this to mean it was because of our age." *Id.* at 841. We concluded in *Mills* that the latter two statements made clear that it was Mills who perceived an age-related edge to Silver's statement that they intended to get rid of her and her co-worker. *Id.* Similarly, in this case, it is Steinhauer who added the sex-based characterization to DeGolier's motivation behind replacing the project leaders. This is the only reasonable interpretation of her statement—that she wanted to replace those individuals—given that the record indicates DeGolier butted heads with the project leaders and was dissatisfied with their performance, and that she hired a man to replace one of the project leaders.

Other statements Steinhauer points to are likewise unhelpful. For instance, he points to the fact that DeGolier used the word "guys" and the phrase "good old boys'

---

(...continued)
Kemp: "Ms. DeGolier told me explicitly that it was her 'intent' to turn around the male power structure so that females would control the organization." In the context of the rest of the record, this statement would seem to be related to DeGolier's clear intent to rid the WCC of those serving as project leaders (all of whom were men) and put Stevens (a woman) temporarily in charge, as opposed to a statement of discriminatory intent. However, even if this statement created an inference that DeGolier intended to promote women to leadership positions, it is unrelated to Steinhauer's firing because he served as a low-level assistant and was not part of the "power structure."

club." DeGolier explained that she used "guys" to refer to both men and women. And that she used "good old boys' club" to refer to those (both men and women) entrenched in the former ways of the WCC. But even assuming she used those terms to refer only to men, there is nothing inherently anti-male about those phrases, and their use in no way creates a reasonable inference that sex motivated an employment decision, any more than the use of "gals" or "good old girls' club" would indicate an anti-female animus. *See DeLoach v. Infinity Broadcasting*, 164 F.3d 398, 403 (7th Cir. 1999) (reference to old boys' network does not indicate age animus, but rather is a comment about those in power). Similarly, the fact that DeGolier referred to one of the men as a "pompous male" does not seem to indicate a sex bias but a bias against pompous subordinates, but in any event, this comment was not made to Steinhauer and was made in passing, and also is unrelated to any employment decision. *Curry v. Menard, Inc.*, 270 F.3d 473, 477 (7th Cir. 2001) (inappropriate remarks not directed at employee are not direct evidence of discrimination); *Indurante v. Local 705, Intern. Broth. of Teamsters, AFL-CIO*, 160 F.3d 364, 367 (7th Cir. 1998) (stray remarks not related to the disputed employment action are not direct evidence of discriminatory intent).

Next, Steinhauer points to the fact that DeGolier included in her weekly newsletter two jokes making fun of men: "Give a man a fish and he will eat for a day. Teach him how to fish, and he will sit in a boat and drink beer all day." And "The surest way to make a monkey out of a man is to quote him." These two jokes do not demonstrate an anti-male animus related to employment, but instead merely portray common humor that could be expressed in almost any setting. Moreover, as the record demonstrates, these were but two of the many digs taken over approximately two years, with other newsletters making fun of lawyers, doctors

and police officers. Likewise, DeGolier's alleged musings that women are part of a super-human group which men are not qualified to join, and that men are silly and not as smart as women, while trite, are inconsequential in this context. If the same comment substituted women as the object of ridicule, it would be similarly insignificant in demonstrating that an employer discriminated against someone because of sex. These inane comments do not constitute sufficient evidence of anti-male bias to create an issue of fact as to DeGolier's motivation for firing Steinhauer.

Steinhauer next points to several conversations DeGolier had with two other employees—Decker and Stevens—about their divorces, and negative comments they made during these vent sessions about their ex-husbands. He also focuses on a statement DeGolier made to Decker during one such conversation to the effect that Decker was weak and that men prey on weak women. No doubt it is the rare case when a conversation about an ex-spouse is complimentary. And the comment about Decker says a lot more of DeGolier's negative opinion of Decker than it does of men in general. These personal conversations, while inappropriate in a working environment, were just that— personal conversations about the women's dissatisfaction with their marriages and their husbands, the resulting divorces, and the continuing problems they were having with their ex-husbands. Similarly, comments DeGolier allegedly made that she had her skirts shortened to have her way with men and that one of the project leaders was "led by his penis," while clearly inappropriate, do not reasonably create an inference that DeGolier harbored a general anti-male bias, much less an anti-male bias in the professional arena. Moreover, Steinhauer has failed to show a connection between any of these conversations and DeGolier's employment decisions. *Hong v. Children's Memorial Hospital*, 993

F.2d 1257, 1266 (7th Cir.1993) (alleged discriminatory remarks, when unrelated to the employment decision in question, are not evidence that employer relied on illegitimate criteria); *Smith v. Firestone Tire and Rubber Co.*, 875 F.2d 1325, 1330 (7th Cir.1989) (same); *Oest v. Illinois Dep't of Corrections*, 240 F.3d 605, 611 (7th Cir. 2001) (comments must be more than the random office banter or stray remark to constitute proof of discriminatory intent); *Schaffner v. Glencoe Park Dist.*, 256 F.3d 616, 622-23 (7th Cir. 2001) (same); *Fuka v. Thomson Consumer Electronics*, 82 F.3d 1397, 1403-04 (7th Cir. 1996) (plaintiff must show remarks related to employment decision).

Moreover, even if these comments were sufficient to create an inference of an anti-male bias, to avoid summary judgment Steinhauer must still present sufficient evidence that would allow a reasonable jury to find that the defendants discriminated against him because of his sex, and the record, as a whole, prevents such a finding. *See Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1570 (7th Cir. 1989). *See also Rogers*, 320 F.3d at 753. Rather, the record shows that Steinhauer was hired less than six months before his termination by DeGolier, based on Stevens' recommendation, and that the same two individuals later decided to fire him. Under these circumstances, it is unreasonable to infer that DeGolier and Stevens decided to terminate Steinhauer based on his sex since they had just decided to hire him notwithstanding his sex. *E.E.O.C. v. Our Lady of the Resurrection*, 77 F.3d 145, 152 (7th Cir. 1996); *Roberts v. Separators, Inc.*, 172 F.3d 448, 452 (7th Cir. 1999); *Ritter v. Hill 'N Dale Farm, Inc.* 231 F.3d 1039, 1044 (7th Cir. 2000). This is especially true since Steinhauer was replaced by a man. Apparently the man who replaced him, Voeltz, was part of the DeGolier-Stevens fan club and was willing to follow their agenda rather than his own. In fact, the record as a whole makes clear that what was motivating DeGolier and

Stevens was not sex, but on which side of the power struggle various employees fell. Those on DeGolier and Stevens' side fared well; those—both men and women—sticking to their former ways and battling the new management had problems, thus explaining DeGolier's comments about the "good old boys" and ridding WCC of those running the projects department. As a whole, the record does not contain sufficient evidence to create a reasonable inference of sex discrimination, and accordingly summary judgment was appropriate.

## III.

In sum, Steinhauer failed to present sufficient evidence to establish a prima facie case of sex discrimination because he failed to show that he was replaced by a woman or that a similarly situated female was treated more favorably. Steinhauer also failed to create a reasonable inference of sex discrimination under the direct method, as the evidence he presented did not establish directly or circumstantially that his termination was motivated by his sex. Moreover, the record as a whole negates any reasonable inference of sex discrimination where the various people testifying make clear that DeGolier had problems with both men and women subordinates, and hired and fired both, including Steinhauer. For these and the foregoing reasons, we AFFIRM.

No. 03-1142                                                    15

A true Copy:

    Teste:

                          _____

                      *Clerk of the United States Court of*
                      *Appeals for the Seventh Circuit*