**Mark WERMER, Plaintiff,**

v.

**LA CROSSE COUNTY, Defendant.**

**No. 05–C–0092–C.**

United States District Court,
W.D. Wisconsin.

Jan. 3, 2006.

James G. Birnbaum, La Crosse, WI, for Plaintiff.

Anna M. Pepelnjak, Weiss Berzowski Brady LLP, Milwaukee, WI, for Defendant.

## OPINION AND ORDER

CRABB, District Judge.

Plaintiff Mark "Red" Wermer had been employed by defendant La Crosse County for eight years when defendant terminated his employment in 2001. In this civil action for injunctive and monetary relief, plaintiff contends that defendant retaliated against him for participating in legal action against defendant and discriminated against him because of his gender, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § § 2000e–2000e–17. Plaintiff alleges that defendant retaliated or discriminated against him in a number of ways: (1) denying him a promotion in March 2000; (2) locking him out of defendant's computer system for several months between May and September 2000; (3) not allowing him to attend certain conferences in September and October 2000; (4) not assigning him to the Visions software project in November 2000; (5) taking disciplinary action against him in March 2001; (6) assigning him an undesirable work schedule in April 2001; (7) denying him a pay increase on or after June 2001; and (8) terminating his employment in July 2001.

This case is before the court on defendant's motion for summary judgment, which will be granted in part and denied in part. Plaintiff failed to raise all but one of his claims before the Equal Rights Division within the applicable limitations period as he was required to do before filing in federal court. Therefore, I will grant defendant's motion for summary judgment on those claims. The one claim he did raise with the Equal Rights Division in a timely manner is his claim that defendant's termination of plaintiff's employment was an act of retaliation and sex discrimination. I have addressed this claim as two separate claims, one dealing with retaliation and the other with discrimination. I will grant defendant's motion for summary judgment on plaintiff's claim that defendant's termination of his employment was an act of sex discrimination because plaintiff has not produced evidence from which a trier of fact could reasonably conclude defendant discriminated against him on that basis, but I will deny defendant's motion on plaintiff's claim that defendant's termination of his employment was an act

of retaliation because plaintiff has produced evidence from which a trier of fact could reasonably conclude that defendant retaliated against him.

In determining the material and undisputed facts, I have considered defendant's proposed findings of fact and plaintiff's responses. Rather than submitting a separate document listing his proposed findings of fact, plaintiff included proposed findings of fact in his response to defendant's proposed findings. Because defendant failed to reply to these additional proposed facts, I have accepted as true those facts proposed by plaintiff that were adequately supported by evidence in the record. I have disregarded those proposed findings of fact and responses that constituted legal conclusions, were argumentive or irrelevant, were not supported by the cited evidence or were not supported by citations specific enough to alert the court to the source of the proposal. From the parties' proposed findings of fact and the record, I find the following to be material and undisputed.

## UNDISPUTED FACTS

### A. *Parties*

Plaintiff Mark "Red" Wermer is an adult resident of the state of Wisconsin. Defendant La Crosse County is located in Wisconsin.

### B. *Plaintiff's Employment with Defendant: 1993–2001*

The La Crosse County Department of Human Services includes the Family and Children's Services Division, which provides assistance to children, youth and families, and which is responsible for the La Crosse County Juvenile Detention Facility. Defendant hired plaintiff to work in the Juvenile Detention Facility in March 1993.

Ronald Allers was the superintendent of the detention facility from its opening in 1990 through June 2001 and plaintiff's supervisor from the time plaintiff was hired until June 2001. Allers conducted written evaluations of plaintiff on January 24, 1995, January 29, 1996, February 25, 1998, March 19, 1999 and January 26, 2001. Except for the January 1996 review, which indicated that plaintiff's overall performance needed improvement, plaintiff's performance reviews indicated that plaintiff either met or exceeded defendant's expectations in every category in which plaintiff was evaluated.

Jill Dunne was one of plaintiff's co-workers at the detention facility. Like plaintiff, she was a facility supervisor. Employees at the detention facility worked one of three shifts. From the time she was hired, Dunne always worked the first shift. When plaintiff was first hired he was assigned to the second shift. He was later assigned to work the "split-third shift," which meant his hours spanned parts of the second and third shifts.

In March 2000, Dunne, plaintiff, David Steinberg and James Townsend applied for the position of administrative supervisor at the facility. Steinberg was hired for the position.

Dawn Hellwig and Glenn Schmocker were employed by defendant at the detention facility. Sometime between January and April 2000, Hellwig filed a discrimination complaint against defendant with the Wisconsin Department of Workforce Development, Equal Rights Division. Gerald Huber, the Director of Human Services for La Crosse County, became aware that plaintiff was listed as a witness in Hellwig's complaint at the time the complaint was filed. Hellwig and defendant entered into a settlement agreement on April 26, 2000.

On June 15, 2000, Schmocker filed a discrimination complaint against defendant with the Equal Rights Division. An administrative law judge held a hearing on Schmocker's case on September 13, 2001.

On July 27, 2000, Steinberg notified staff members that they could request permission to attend the Wisconsin Juvenile Detention Association conference. Plaintiff did not request permission to attend this conference; instead, he asked to attend the Wisconsin Juvenile Court Intake Association/Wisconsin Juvenile Officers Association Conference. Steinberg denied plaintiff's request but authorized Dunne to attend the same conference.

On January 11, 2001, Director of Human Services for La Crosse County, Gerald Huber, forwarded an email to La Crosse County staff that had been written by the Wisconsin chapter of the National Association of Social Workers. Plaintiff replied to Huber's email, stating:

> In the future, I would appreciate if you would refrain from sending me any more worthless blather from an obviously biased source with a clearly political agenda.

Huber then sent an email to Steinberg and other supervisors at the detention facility that included plaintiff's response to his earlier email and contained disparaging comments about plaintiff. Steinberg printed Huber's email. Before Steinberg picked up the email from the printer, Rebecca Gruenwald, a youth care worker, read it. Gruenwald told co-workers about the email she had read and word got back to plaintiff. Plaintiff had a conversation with Gruenwald and asked her what Huber had written about him. Gruenwald later complained to Steinberg that plaintiff treated her poorly during that conversation. Steinberg wrote plaintiff a letter of warning.

On January 26, 2001, Allers conducted a written evaluation of plaintiff that was plaintiff's best evaluation during his employment. Allers wrote that plaintiff either met or exceeded defendant's expectations in every criterion in which he was evaluated. Sometime in January or February 2001, plaintiff decided to remove a mattress from one of the detention facility's youth residents for disciplinary purposes. Shortly thereafter, Todd Williams, who also worked at the detention facility, returned the mattress to the resident. Plaintiff confronted Williams regarding the incident. Williams described plaintiff's behavior during their conversation as follows:

> He [plaintiff] then became louder and more vocal using a number of swear words and stated, "Well, if you want to play that fucking game, just remember, third shift always follows second shift." He also asked who was working in secure that night and I told him I wasn't sure. He then said that it was Scott and Trish and "that fucking figures that it would be those two with their fucking game playing, especially Trish."

Plaintiff then spoke with Tricia Wavra, another employee at the detention facility. Wavra subsequently filed a grievance, stating in part:

> [Plaintiff] continued to scream at me, saying "You don't know how to do your fucking job, all you do is baby the fucking kids and you want to play games with me, well two can play those fucking games." I replied, "I am not playing games, I didn't do anything wrong, look at the way you are acting, it is not very mature, Red, you are being unprofessional." Mark replied, "You are the one who is fucking immature, not me."

Debra Bjerkos, who was a youth care worker at the detention facility, overheard plaintiff say to Wavra, "If you would have been doing your fucking job . . . ."

On February 26, 2001, Steinberg sent plaintiff a letter that stated in part:

Over the past week, we have had the opportunity to review the written incident from Todd Williams, the Union grievance regarding Trish Wavra, and the written statement from Deb Bjerkos. We have also talked to Dawn Hellwig and Glen Schmocker at your request, have read Dawn's written statement, and have heard your side of the incidents, which were reported to us. We have come to the following conclusion:

1. You admitted to approving "per Red" the taking away of Dustin's mattress as a disciplinary issue because he used two mattresses instead of one mattress. We have not in any of the conversations with you or anyone else or written statements noted it was taken away for safety concerns. This is in violation of the Administrative Code DOC 346.36(2)(c) which indicates the facility must provide a mattress if there is an overnight stay.

It is our understanding that mattresses have been taken away as a result of safety issues and concerns, not for disciplinary reasons.

Jail Inspector Scott Morris agrees that is the correct interpretation of the Code.

2. You have admitted that you raised your voice to a co-worker and Union employee and also used profanity. Regardless of who said what first, there is no rationale for a supervisor raising their voice or using profanity with another co-worker or employee. As a supervisor, if an employee is insubordinate the supervisor needs to deal with it in a professional manner, de-escalate the situation and take disciplinary action with the employee or file a complaint if it is a co-worker.

3. You admitted Deb's statement was correct and that the situation made her feel uncomfortable. You also admitted Trish probably did feel she was being harassed at that time. The kind of behavior and verbal exchange described in Deb's statement creates a hostile work environment for Deb, Trish and others around in JDF....

Therefore in regard to your behavior and violations we are mandating the attached Memorandum of Understanding.

The Memorandum of Understanding reads as follows:

1. You will receive a five (5) work day suspension without pay...

2. You must contact our EAP and enroll, attend, and complete the first available Anger Management class...

3. You must sign the attached apology letter to Todd and to Trish ...

4. There must be no retaliatory behavior or conversations against Todd or Trish.

5. There must be *no* yelling, using profanity, inappropriate language or intimidating behaviors that have the possibility of creating a hostile work environment.

6. You must comply with the Administrative Code DOC 346.36(2)(c).

7....

8. You must understand the chain of command as mentioned previously ...

Plaintiff signed the Memorandum of Understanding and attached the following addendum to it:

My signature on the "Memorandum of Understanding" in no way implies that I am making an admission of guilt or wrongdoing to any of the 8 points or to the 5 conclusions that you five people state in your memo dated February 26, 2001. Your intent was to terminate my employment, as was the intent of the

"Union," and, the "Memorandum" plus the memo are the measures you are using to gain that effect.

As of March 15, I will have been employed by La Crosse County for 8 years. During that time *I have never retaliated in behavior or conversation against anyone* and I will maintain that moral high ground. During those same eight years I have repeatedly reported sexual harassment, sexual discrimination, targeted harassment, racial discrimination, discrimination based on marital status, denial of equal opportunities for promotion and training, cronyism, retaliation and threats of sodomy. I have reported the perpetrators and the only thing you've done in response is retaliate against me for reporting all those things.

I did not violate Administrative Code DOC 346.36(2)(c), as you stated and implied. For the eight years that I have been employed by La Crosse County, it has been a common practice and procedure to take mattresses for disciplinary and control purposes, not "as a result of safety issues and concerns," as you stated. That practice and procedure has been with the full knowledge of Ron Allers and Dave Steinberg; it had been the practice and procedure of Dave Steinberg prior to his hire as the Administrative Supervisor, as it has been for all past and current supervisors. Until our meeting on February 26, 2001, no one has stated verbally or in print that we have a policy to the contrary. I was following the practice and procedure that I was trained to do . . . .

Plaintiff had appointments with social worker Schweitzer and psychologist Bablitch regarding anger management. Plaintiff signed release forms authorizing Steinberg to communicate with the Gundersen Clinic and Lutheran Hospital regarding his attendance at these anger management sessions.

After plaintiff submitted his addendum to the Memorandum of Understanding, Huber asked him to substantiate his claim that he had "repeatedly reported sexual harassment, sexual discrimination, targeted harassment, racial discrimination, discrimination based on marital status, denial of equal opportunities for promotion and training, cronyism, retaliation and threats of sodomy." Plaintiff sent Huber copies of two letters he had written to Allers and Huber in 1998 and 1999, alleging various forms of discrimination. Plaintiff also met with Huber and other supervisors, including Steinberg and Allers, and repeated his assertions about various incidents of discrimination in 1999 and earlier.

On April 24, 2001, plaintiff called in sick and did not attend work. That same day, he attended a school board meeting. On June 13, 2001, Steinberg notified plaintiff that he had used sick time inappropriately.

In May 2001, defendant conducted an audit of the detention facility, using auditors brought in from outside institutions. The auditors interviewed staff members at the detention facility. Plaintiff agreed to participate in the audit by speaking with one of the auditors. The audit report included three "critical recommendations," one of which was:

Terminate an individual third shift supervisor. This person has created a hostile work environment that elevates the risk of losing more valued staff. It fosters negativity and insubordination. Based on the interviews, overall morale will improve immediately. A leadership and decision-making position is no place for an individual with this attitude, who intimidates employees, undermines administration and encourages baseless lawsuits.

Plaintiff is the "individual third shift supervisor" referred to in the audit report. At least ninety-five percent of the staff members who participated in the audit reported problems involving plaintiff.

On May 7, 2001, Schmocker filed a second discrimination complaint against defendant with the Equal Rights Division. On May 26, 2002, the Equal Rights Division issued an Initial Determination of Probable Cause.

On June 20, 2001, plaintiff attended a supervisors' meeting at the detention facility. Plaintiff brought a recorder to audio tape the meeting. Steinberg told plaintiff to remove the tape recorder because confidential information regarding juveniles would be discussed. When plaintiff refused to withdraw the tape recorder, Steinberg terminated the meeting.

On July 23, 2001, plaintiff was notified in writing that defendant was considering terminating his employment. The letter set forth a number of allegations against plaintiff, including the following:

> The county has been advised that a leadership and decision-making position is no place for an individual with your attitude, who intimidates employees, undermines administration and, possibly, encourages baseless lawsuits.

Plaintiff was afforded the opportunity to present information to defendant at a hearing on July 25, 2001. Plaintiff appeared with counsel, offered comments and submitted a memorandum, stating that he was being subjected to disparate treatment. On July 28, 2001, Huber terminated plaintiff's employment.

### C. *Plaintiff's Complaints Against Defendant*

Plaintiff filed a complaint against defendant with the Equal Rights Division on April 23, 2001. Plaintiff listed "sex/gender, marital status, creed & political be-

liefs, sexual harassment, retaliation" as the basis for his complaint. In his complaint plaintiff indicated that defendant's alleged misconduct began on June 28, 2000. The Equal Rights Division instructed plaintiff to amend his complaint to include additional information.

Almost one year later, on April 15, 2002, plaintiff filed another complaint against defendant with the Equal Rights Division. In this complaint, plaintiff asserted that defendant's termination of his employment on July 28, 2001 was an act of retaliation and gender discrimination.

On May 10, 2002, plaintiff filed a complaint with the Equal Rights Division to amend the April 23, 2001 complaint. In the May 10, 2002 complaint, plaintiff included alleged acts of retaliation and discrimination by defendant that he had not included in his April 23, 2001 complaint, but did not include any reference to defendant's termination of plaintiff's employment on July 28, 2001.

On May 29, 2002, the Equal Rights Division served defendant with a copy of plaintiff's May 10, 2002 complaint. The Equal Rights Division did not serve defendant with a copy of plaintiff's April 23, 2001 and April 15, 2002 complaints.

The Equal Rights Division investigated plaintiff's allegations and issued a Preliminary Determination on January 30, 2004 dismissing as untimely those claims alleging discrimination prior to June 27, 2000, together with an Initial Determination of No Probable Cause on the remaining claims. Plaintiff appealed both decisions. The Preliminary Determination was upheld. Plaintiff voluntarily dismissed his appeal of the Initial Determination of No Probable Cause and filed the present lawsuit.

## DISCUSSION

### A. *Administrative Exhaustion*

Before suing in federal court, a plaintiff alleging a Title VII violation must file a claim with the Equal Employment Opportunity Commission. 42 U.S.C. § 2000e–5. Generally, parties must file their claims within 180 days of the alleged "unlawful employment practice," but where an aggrieved employee files first with a state or local agency possessing the authority to address the discrimination, the limitations period is extended to 300 days. 42 U.S.C. § 2000e–5(e); *Russell v. Delco Remy Division of General Motors Corp.*, 51 F.3d 746, 750 (7th Cir.1995). Wisconsin is one of many states that have entered into a work sharing agreement with the Equal Employment Opportunity Commission in which both the state and federal agencies treat a complaint filed with one agency as cross-filed with the other and the state agency waives its right to exclusive jurisdiction over the initial processing of a complaint. Under 29 C.F.R. § 1601.74(a) n. 12, filing with the Equal Rights Division extends the time for filing all charges from 180 days to 300 days of the alleged discriminatory act.

The threshold question is whether plaintiff can proceed in this lawsuit on claims going back to June 28, 2000 or whether he is limited to pursuing claims relating to acts that allegedly occurred after July 14, 2001 (300 days before plaintiff filed his amended complaint with the Equal Rights Division). The answer depends on which of the complaints that plaintiff filed with the Equal Rights Division is considered to be the operative one.

The purpose of the 300–day limitation for filing a Title VII complaint is to give prompt notice to the employer. *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 398, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982).

After a complainant files a claim with the Equal Employment Opportunity Commission or the appropriate state agency, it becomes the agency's duty to serve the charge on the respondent and to investigate the claim. 42 U.S.C. § 2000e–5(e); 29 C.F.R. §§ 1601.14(a), 1601.15. The Wisconsin Department of Workforce Development has promulgated regulations governing the procedures of the Equal Rights Division. These regulations state that after an individual files a complaint that meets certain requirements (including the name and address of the complainant and the respondent and a "concise statement of the facts, including · pertinent dates"), the Equal Rights Division will serve a copy of the complaint on the respondent. Wis. Admin. Code §§ DWD 218.03, 218.04 (2005).

The Equal Rights Division received plaintiff's complaint on April 23, 2001, and assigned it a charge number but did not serve it on defendant. The Court of Appeals for the Seventh Circuit has held that in certain cases where the relevant administrative agency failed to follow procedure or misled the complainant regarding his Title VII filing, the doctrine of equitable tolling applies and the complainant does not have to pay for the agency's mistakes. *See, e.g., Early v. Bankers Life and Casualty Co.*, 959 F.2d 75, 81 (7th Cir.1992) ("Misleading conduct by the EEOC can be a basis for tolling the administrative statute of limitations."). However, the present case is not one in which the administrative agency failed to act in accordance with procedure. Therefore, equitable tolling does not apply.

Plaintiff concedes that the Equal Rights Division told him "that more information would be needed to process the [April 23, 2001] complaint before sending it to the Respondent, La Crosse County." Plt.'s Br., dkt. # 17, at 1. Plaintiff knew the ball

was in his court and if he did not respond to the Equal Rights Division's request it would not send his complaint to defendant. Plaintiff has not even attempted to explain why he failed to comply promptly with the Equal Rights Division's request. He was represented by counsel when he filed the April 23, 2001 complaint and when he received the Equal Rights Division's request for more information. It is undisputed that plaintiff waited over one year to respond to the Equal Rights Division's warning that it would not send his complaint to defendant until he responded to its request for more information. In light of his failure to pursue his April 23, 2001 complaint with the Equal Rights Division, I conclude that the effective filing date of plaintiff's complaint was May 10, 2002.

Defendant concedes that plaintiff may proceed on those claims he raised in the May 10, 2002 complaint that pertain to allegedly discriminatory acts that occurred after July 14, 2001. However, none of the claims raised in that complaint pertain to acts that occurred after July 14, 2001. Accordingly, plaintiff may not proceed in this lawsuit on the claims he raised in either his April 23, 2001 complaint or his May 10, 2002 complaint. This leaves only the April 15, 2002 complaint as a possible source of viable claims.

Defendant appears to believe that plaintiff raised his claim of discriminatory and retaliatory termination in his May 10, 2002 complaint. In its brief, defendant writes, "It is undisputed that the first discrimination complaint received by La Crosse County was filed on May 10, 2002. In order to be timely, then, the events giving rise to the complaint must post-date July 14, 2001. Only one of the events alleged in the complaint took place after July 14, 2001—Wermer's termination from employment." Dft.'s Br., dkt. # 9, at 16. In fact, plaintiff did not raise the discriminatory

and retaliatory termination claim in his May 10, 2002 complaint. Plaintiff raised the discriminatory and retaliatory termination claim in his April 15, 2002 complaint with the Equal Rights Division. The discriminatory and retaliatory termination claim based on the July 28, 2001 termination was timely raised on April 15, 2002.

Despite plaintiff's assertion that the Equal Rights Division "consolidated the complaints," defendant contends that the only complaint it received from the Equal Rights Division was the one dated May 10, 2002. Dft.'s PFOF, dkt. # 11, ¶ 1; Plt.'s Resp. to Dft.'s PFOF, dkt. # 18, ¶ 1. Defendant has submitted the mailing it received from the Equal Rights Division in late May 2002, which contains only the May 10, 2002 complaint. In its mailing to defendant, the Equal Rights Division made no mention of having consolidated plaintiff's April 15 complaint with the May 10 complaint.

In responding to defendant's proposed findings of fact, plaintiff stated explicitly that he filed "a new complaint alleging retaliation" with the Equal Rights Division and attached a copy of the April 15, 2002 complaint. Plt.'s Resp. to Dft.'s PFOF, dkt. # 18, ¶ 1. Although defendant contends that the only complaint it received from the Equal Rights Division was the May 10 complaint, at the same time it does not dispute plaintiff's assertion in his response to defendant's proposed findings of fact that he filed the April 15 complaint with the Equal Rights Division. In its reply brief, defendant did not raise the defense that it did not receive a copy of the April 15 complaint from the Equal Rights Division and that the claims asserted therein are now time-barred.

The United States Supreme Court has stated that the deadline for filing a complaint with the Equal Employment Opportunity Commission is not a jurisdictional

prerequisite and that it should be treated as a statute of limitations. *Zipes,* 455 U.S. at 393, 102 S.Ct. 1127. Since defendant has not argued as an affirmative defense the position that plaintiff's termination claim is barred by the statute of limitations, I conclude that it has waived that defense. Therefore, plaintiff's termination claim was timely filed. Before I address the merits of plaintiff's claim that his termination was an act of sex discrimination and retaliation by defendant, I will address plaintiff's argument that the continuing violation doctrine should apply to his claims that are otherwise time-barred.

### B. *Continuing Violation Doctrine*

■ Generally, conduct that occurred outside the limitations period may not be challenged under Title VII. *Galloway v. General Motors Service Parts Operations,* 78 F.3d 1164, 1167 (7th Cir.1996). The United States Supreme Court has explained that the continuing violation doctrine permits "consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, ... for the purpose of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period." *Dandy v. United Parcel Service, Inc.,* 388 F.3d 263, 270 (7th Cir.2004) (citing *National R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 105, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002)). However, the continuing violation doctrine precludes recovery for "discrete acts of discrimination or retaliation that occur outside the statutory time period." *Id.*

■ Plaintiff asserts that "the continuing violation doctrine is available to [him] to render timely those instances of discrimination that fall outside the statute of limitations, but which constitute part of defendant's pattern of discriminatory conduct." Plt.'s Br., dkt. # 17, at 14. Despite this sweeping statement in his brief, plaintiff has not asserted a hostile environment claim against defendant and has not submitted any proposed facts or legal arguments to support a hostile environment claim. Accordingly, plaintiff cannot avail himself of the continuing violation doctrine. His only timely claim is that his termination was an act of sex discrimination and retaliation by defendant.

### C. *Gender Discrimination*

A plaintiff can meet his burden of proving intentional discrimination using either the direct or the indirect method of proof. Under the direct method, plaintiff must present direct evidence (an acknowledgment of discriminatory intent by defendant), *Gusewelle v. City of Wood River,* 374 F.3d 569, 574 (7th Cir.2004), or construct a "convincing mosaic" of circumstantial evidence that provides the basis for drawing an inference of intentional discrimination, *Cerutti v. BASF Corp.,* 349 F.3d 1055, 1061 (7th Cir.2003). Plaintiff does not contend that he can show that his termination was the result of sex discrimination using the direct method and has not attempted to do so. Instead, he relies on the indirect method of proof.

The indirect method of proving unlawful discrimination involves the burden-shifting scheme established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). To survive summary judgment under *McDonnell Douglas,* a plaintiff has the initial burden to establish a prima facie case of discrimination. *Hong v. Children's Memorial Hospital,* 993 F.2d 1257, 1261 (7th Cir.1993). If the plaintiff makes out a prima facie case, he is entitled to "a presumption that the employer unlawfully discriminated against the employee." *EEOC v. Our Lady of the Resurrection Medical Center,* 77 F.3d 145, 148 (7th Cir.1996) (quoting *St.*

*Mary's Honor Center v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)). Once the plaintiff has met this burden, defendant has the burden of rebutting the presumption by coming forward with a legitimate nondiscriminatory reason for the employment actions. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. If the defendant satisfies this standard, the plaintiff must then demonstrate that there is a genuine issue of material fact about the honesty of the defendant's stated reason for plaintiff's termination. *Hudson v. Chicago Transit Authority,* 375 F.3d 552, 561 (7th Cir.2004). "Although the burden of production shifts under [the indirect] method, 'the burden of persuasion rests at all times on the plaintiff.'" *Haywood v. Lucent Technologies, Inc.,* 323 F.3d 524, 531 (7th Cir.2003) (quoting *Klein v. Trustees of Indiana University,* 766 F.2d 275, 280 (7th Cir.1985)). Defendants are entitled to summary judgment unless plaintiff introduces evidence from which a reasonable jury could conclude that the non-discriminatory reason put forth by defendants is a lie. *Shager v. Upjohn Company,* 913 F.2d 398, 401 (7th Cir.1990).

In order to make out a prima facie case, plaintiff must show that (1) he is a member of a protected class; (2) he was meeting his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees not in the protected class were treated more favorably. *Haywood,* 323 F.3d at 530 (citing *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817).

Plaintiff has failed to make out a prima facie case of discrimination. Although plaintiff can show he suffered an adverse employment action when he was terminated, he cannot establish the other three elements of a prima facie case.

■ Title VII's prohibitions against sex discrimination generally protect men as well as women. *Gore v. Indiana Univ.,* 416 F.3d 590, 592 (7th Cir.2005) (citing *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (men); *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (women)). However, "because it 'is the unusual employer who discriminates against majority employees,' *Mills v. Health Care Serv. Corp.,* 171 F.3d 450, 456–57 (7th Cir.1999), a male plaintiff alleging gender discrimination must show something more than the fact that he is gendered." *Id.* (citing *Katerinos v. United States Dept. of the Treasury,* 368 F.3d 733, 736 (7th Cir.2004)). "This was what we meant in *Phelan v. City of Chicago,* 347 F.3d 679, 684 (7th Cir.2003), when we said that in cases of reverse discrimination, 'the first prong of the McDonnell test cannot be used.' Rather, the plaintiff in such cases 'must show background circumstances that demonstrate that a particular employer has reason or inclination to discriminate invidiously against whites [or men] or evidence that there is something 'fishy' about the facts at hand.'" *Id.* (citing *Phelan v. City of Chicago,* 347 F.3d 679, 684 (7th Cir.2003)).

■ Plaintiff has neither provided any facts suggesting that defendant had an inclination to discriminate against males nor provided evidence of anything "fishy" about the facts at hand. Even if he had done so, plaintiff would still fail to establish a prima facie case of discrimination because he does not meet the third and fourth requirements of a prima facie case.

Plaintiff has not shown that he was meeting his employer's legitimate expectations. Plaintiff attempts to challenge defendant's assertion that it was not satisfied with plaintiff's performance by pointing to the written evaluations Allers completed

from 1995 to 2001. In particular, plaintiff argues that Allers gave him excellent ratings in his January 2001 review, just months prior to his termination. However, defendant has proposed facts showing that plaintiff engaged in behavior that would lead a reasonable employer to be dissatisfied with an employee. In his defense, plaintiff argues that ever since defendant found out about his involvement in Hellwig and Schmocker's complaints with the Equal Rights Division, defendant began to "pepper his personnel record with problems in preparation for his termination." Plt.'s Br., dkt. # 17, at 25.

I do not need to review each of defendant's allegations of misconduct to determine whether it was a legitimate allegation of misconduct or a meritless allegation made to retaliate against plaintiff for testifying on behalf of Hellwig and Schmocker. It is plaintiff's burden to propose facts to counter defendant's allegations that he engaged in conduct that would lead a reasonable employer to question his performance. Defendant has shown that plaintiff engaged in several heated conversations with other employees where he used profanity such as, "You don't know how to do your fucking job," and that several employees complained about plaintiff's behavior. Defendant has done enough to show that plaintiff was not meeting its legitimate expectations. Plaintiff has failed to adduce evidence to put into question defendant's assertion that it was dissatisfied with plaintiff's performance because of his inappropriate exchanges with other employees.

Plaintiff also fails to meet the last requirement of the prima facie test, which requires showing that similarly situated employees not in the protected class were treated more favorably. Plaintiff argues that Dunne, who was a female supervisor at the detention facility, received more favorable treatment than he did on several occasions. Although plaintiff has shown that Dunne had the same job title as he, plaintiff has not established that he and Dunne were similarly situated. To meet his burden of showing that another employee was similarly situated, plaintiff must show that he is "directly comparable to her in all material respects." *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir.2002).

In this case, there is evidence in the record showing that plaintiff acted in ways that defendant deemed unprofessional, such as screaming profanities at colleagues. Also, the May 2001 audit report revealed that over ninety-five percent of participating employees reported problems involving plaintiff. Furthermore, defendant suspected that plaintiff misused his sick leave to attend a school board meeting. Dunne and plaintiff would be similarly situated only if Dunne also had a record of "problem behavior." If plaintiff had shown that to be the case, then plaintiff could have compared himself with Dunne to show that defendant engaged in sex discrimination when it terminated him but retained her. By not doing this, plaintiff has failed to establish a prima facie case of gender discrimination. Therefore, defendant's motion for summary judgment will be granted as to plaintiff's claim that his termination in July 2001 was an act of sex discrimination.

### D. *Retaliation*

█ A plaintiff may establish a claim of retaliation under the direct or indirect methods of proof. To prove retaliation under the direct method, a plaintiff must show that (1) he engaged in an activity protected by Title VII; (2) he suffered an adverse employment action at the hands of his employer; and (3) a causal connection exists between the activity and the adverse action. *Moser v. Indiana Dept. of Corrections*, 406 F.3d 895, 903 (7th Cir.2005).

Because plaintiff has proposed facts to establish a claim of retaliation under the direct method, I need not discuss the indirect method.

■ Defendant does not dispute that plaintiff suffered an adverse action when his employment was terminated in July 2001. The disputed elements of plaintiff's retaliation claim are whether he engaged in statutorily protected activity and whether there is a causal connection between the protected activity and his termination.

Under Title VII, a protected activity is an employee's opposition to any employer practice that is made unlawful by Title VII or the employee's participation in "an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e–3(a). Plaintiff agreed to serve as a witness in Hellwig's claim of discrimination against defendant in early 2000. Defendant knew that plaintiff was listed as a witness in Hellwig's complaint and does not dispute that this constituted protected activity by plaintiff.

Plaintiff also agreed to serve as a witness in Schmocker's discrimination cases against defendant. Schmocker filed two discrimination cases against defendants, one in June 2000 and another in May 2001. However, defendant denies having known about plaintiff's involvement in Schmocker's complaint before it decided to terminate plaintiff in July 2001. Dft.'s Br., dkt. # 9, at 25. "There generally can be no causal link between protected activity and an adverse employment action if the employer remained unaware of the protected activity." *Dey v. Colt Constr. & Dev. Co.,* 28 F.3d 1446, 1458 (7th Cir.1994).

Plaintiff attempts to contradict defendant's assertion that it had no knowledge of plaintiff's participation in Schmocker's complaints by introducing the deposition testimony of Dunne, who stated that she probably became aware that plaintiff was listed as a witness in Schmocker's complaint at the time the complaint was filed and that this fact was probably mentioned at a supervisors' meeting. The record contains no indication whether Dunne is referring to Schmocker's complaint of June 2000 or May 2001. However, drawing all inferences in the light most favorable to the non-moving party, as I must on a motion for judgment, I can conclude that plaintiff has raised a genuine issue whether defendant knew before it terminated plaintiff that he had engaged in protected activity regarding one or both of Schmocker's complaints.

Besides showing that he engaged in protected activity, plaintiff must show that there is a causal connection between the protected activity and his termination. A plaintiff can show a causal connection either with direct evidence or evidence from which inferences of causation may be drawn. *Samuelson v. Durkee/French/Airwick,* 976 F.2d 1111, 1115 (7th Cir.1992). Plaintiff has offered no direct evidence that his protected activity caused his termination in July 2001. Instead, he has attempted to present evidence from which causation may be inferred.

Plaintiff's primary argument in this case is that his protected activity launched a campaign by defendant to "pepper his personnel record with problems in preparation for his termination." Plt.'s Br., dkt. # 17, at 25. This argument fails because there are facts in the record suggesting that defendant had reasons other than a retaliatory animus to discipline plaintiff. Plaintiff used profane language with his colleagues and subordinates; he attended a personal business meeting when he took a sick day; and he tried to audio tape private staff meetings.

However, plaintiff has introduced a fact from which a reasonable trier of fact could

infer causation between the protected activity and the adverse action. The termination letter plaintiff received on July 23, 2001 contained accusations of wrongdoing, including a statement that plaintiff "possibly, encourages baseless lawsuits." Typically, where there is a long gap between the protected activity and the adverse employment action, "the inference of causation weakens ... and then 'additional proof of a causal nexus is necessary.'" *Oest v. Illinois Dept. of Corrections*, 240 F.3d 605, 616 (7th Cir.2001) (citing *Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 511 (7th Cir.1998)). More than one year elapsed between plaintiff's protected activity regarding Hellwig's complaint and Schmocker's June 2000 complaint and his termination. Without the reference to plaintiff's encouragement of "baseless lawsuits" in the termination letter there would be no evidence of a causal connection between the protected activity and the termination. However, given defendant's explicit reference to plaintiff's encouragement of "baseless lawsuits" in the letter of termination, I conclude that plaintiff has raised a genuine dispute whether defendant terminated his employment to retaliate against him for engaging in protected activity.

Because plaintiff has introduced facts to establish a claim of retaliation, I will deny defendant's motion for summary judgment on plaintiff's claim that defendant's termination of plaintiff was an act of retaliation.

### ORDER

IT IS ORDERED that

1. Defendant La Crosse County's motion for summary judgment is DENIED with respect to plaintiff Mark Wermer's claim that defendant's termination of plaintiff's employment was an act of retaliation.

2. Defendant's motion for summary judgment is GRANTED with respect to all other claims.